Joseph A. Creitz
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090
Fax: (415) 513-4475
Email: joe@creitzserebin.com

Paul M. Secunda*
*admitted pro hac vice*
WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: psecunda@walcheskeluzi.com

Counsel for Plaintiffs and Proposed Class

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

PAUL S. RUBKE and SHERIDA DU LAC DE FUGERES, individually, and as representatives of a Class of Participants and Beneficiaries of the ServiceNow, Inc. 401(k) Plan,

Plaintiffs,

v.

SERVICENOW, INC., and BOARD OF DIRECTORS OF SERVICENOW, INC.

Defendants.

Case No: 3:24-cv-1050-TLT

**SECOND AMENDED CLASS ACTION COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2)**

COMES NOW Plaintiffs, Paul S. Rubke and Sherida du Lac de Fugeres ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries on behalf of the ServiceNow, Inc. 401(k) Plan, by and through their counsel, WALCHESKE & LUZI, LLC, and CREITZ & SEREBIN LLP, as and for a claim against Defendants, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Plaintiffs, individually and on behalf of the Class, allege Defendants ServiceNow, Inc. and Board of Directors of ServiceNow, Inc. (collectively "Defendants" or "ServiceNow") breached their fiduciary duties of prudence and to monitor under the Employee Retirement Income Security Act ("ERISA"), 29 U.SC. § 1132, regarding their ServiceNow, Inc. 401(k) Plan (the "Plan" or "ServiceNow Plan").

2.      The Class is defined as: "All participants and beneficiaries of the ServiceNow, Inc. 401(k) Plan who invested in any of the American Century Target Date Funds (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning February 21, 2018, and running through the date of judgment."

3.      The first day of the Class Period is February 21, 2018.

4.      Defendants breached their fiduciary duties to Plaintiffs and the Class when they: (1) selected and retained imprudent American Century Fund Target Date Funds ("TDFs") when prudent, more suitable TDF "meaningful benchmarks" were readily available at the beginning of the Class Period; and (2) failed to monitor fiduciaries responsible for Plan administration and management on the Retirement Plan Committee for the ServiceNow 401(k) Plan ("Plan Committee") regarding the imprudent Challenged Investments.

5.      These alleged breaches and imprudent investments resulted in the loss of tens of millions of dollars for Plaintiffs and the Class.

6.      Plaintiffs are "participants" in a defined-contribution plan under ERISA Section 3(7), 29 U.SC. § 1002(7): the ServiceNow Plan.

7.    The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015).

8.    As a defined-contribution plan, the Plan allows participants to direct the investment of their contributions, but the investment options included in the Plan are selected by the Plan's fiduciaries.

9.    Defendants are the Plan Sponsor, Plan Administrators, and fiduciaries of the Plan. ServiceNow and its Board of Directors assigned fiduciary management and administrative duties of the Plan to the Plan Committee to manage and administer the Plan.

10.    Under ERISA, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

11.    "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2002) (citing *Tibble*, 575 U.S. at 529–30).

12.    Under this prudent person standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *See Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).

13.    The duty of prudence applies to the "initial selection of investments" as well as to the "continuous monitoring of investments" so that any imprudent investments must be removed.

*Anderson v. Intel Corp.*, No. 19-cv-04618-LHK, 2021 WL 229235, at *5 (N.D. Cal. Jan. 21, 2021).

14.    "Importantly, this standard 'focus[es] on fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" *Id.* (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.* ("*St. Vincent*"), 712 F.3d 705, 716 (2nd Cir. 2013)).

15.    A plaintiff must plead adequate process failure allegations and "meaningful benchmarks" for the imprudent investments. *See Phillips v. Cobham Advanced Elec. Sol., Inc.*, No. 23-cv-03785-EJD, 2024 WL 3228097, at *8  (N.D. Cal. June 28, 2024).

16.    There also must be sufficient facts about how the fiduciaries deviated from the "guidelines concerning the selection, evaluation, and monitoring of Plan investment options." *See Bracalente v. Cisco Sys., Inc.*, No. 22-CV-04417-EJD, 2024 WL 2274523, at *2 (N.D. Cal. May 20, 2024).

17.    During the Class Period, Defendants breached the duty of prudence they owed to the Plan by failing to monitor the American Century TDFs and by not removing these TDFs at the beginning of the Class Period based on information available to the Plan Committee with regard to the suitability and prudence of the American Century TDFs.

18.    To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) in a representative capacity to enforce Defendants' liability under 29 U.S.C. § 1109(a), and to make good to the Plan all losses resulting from these breaches. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

20.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

21.     Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

**PARTIES**

22.     Plaintiff Paul S. Rubke is a resident of the State of California and currently resides in Menifee, California, and during the Class Period, is a participant in the Plan under 29 U.S.C. § 1002(7).

23.     Plaintiff Rubke was employed by ServiceNow from 2013 through May 2022, in the position of Senior Major Incident Manager, based in San Diego, California.

24.     Plaintiff Rubke held the following investments in the Plan: Fidelity 500 Index, the American Century One Choice 2020 Trust S Fund, and American Century In Retirement Trust S Fund. He rolled out of the Plan in June 2023.

25.     Plaintiff Sherida du Lac de Fugeres is a resident of the State of California and currently resides in Mission Viejo, California, and during the Class Period, is a participant in the Plan under 29 U.S.C. § 1002(7).

26.     Plaintiff Fugeres worked remotely from home for ServiceNow as a Senior Global Mobility Specialist from April 2022 through January 2023. She was invested in the American Century One Choice 2050 Trust S. She is a current participant in the Plan.

27.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts in which they held a number of the American Century TDFs during the Class Period, those injuries are fairly traceable to Defendants' unlawful conduct as fiduciaries of the Plan in maintaining the American Century TDFs in the Plan until December 1, 2023, and the harm is likely to be redressed by a favorable judgment.

28.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

29.     The named Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, regarding the imprudence selection, and maintenance of, the Challenged Investments) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

30.     The named Plaintiffs and all participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of prudent Plan investments or the prudent alternatives investments available to the Plan. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for maintaining and monitoring the Plan's investments) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth below.

31.     ServiceNow is an American software company based in Santa Clara, California, that develops a cloud computing platform to help companies manage digital workflows for enterprise operations. Its principal headquarters are located at 2225 Lawson Lane, Santa Clara, CA 95054. In this Amended Complaint, "ServiceNow" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

32.    ServiceNow acted through its officers, including the Board Defendants, to perform Plan-related fiduciary functions in the course and scope of their business. ServiceNow appointed the Plan Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, ServiceNow is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

33.    The Plan Administrator of the Plan is also ServiceNow and its Board. As the Plan Administrator, ServiceNow and its Board are also a fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Plan Administrator has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

34.    In 2023, the Plan had $1,440,613,447 in assets entrusted to the care of the Plan's fiduciaries. As a result, the Plan has the tremendous bargaining power to demand prudent Plan investments. Defendants, however, did not effectively monitor the Challenged Investments.

35.    With 13,688 participants in 2023, the Plan had more participants than 99.75% of the defined contribution Plans in the United States that filed 5500 forms for the 2023 Plan year. Similarly, with $1,440,613,447 in assets in 2023, the Plan had more assets than 99.79% of the defined contribution Plans in the United States that filed 5500 forms for the 2023 Plan year.

**SERVICENOW PLAN'S INVESTMENT POLICY STATEMENT (IPS)**

36.    ServiceNow's investment policy statement ("IPS") that was in place at the beginning of the Class Period is the version dated March 2017. *See* ServiceNow Plan Investment Policy Statement (March 2017) ("March 2017 IPS")

37.    The ServiceNow IPS establishes the policies and guidelines for the ServiceNow, Inc. 401(k) plan and is intended to assist the Retirement Plan Committee in effectively selecting, monitoring, and evaluating investment alternatives made available to participants under the Plan.

*Id.* at 3.

38.     The IPS outlines and prescribes a prudent and acceptable investment philosophy, and sets out the investment management procedures. *Id.*

39.     When a Plan participant does not give instructions on how they want to invest their retirement money in the ServiceNow Plan, their retirement monies are placed into a qualified default investment alternative ("QDIA").

40.     The Plan Committee may elect to utilize a multi-asset class investment option, such as TDFs, as the QDIA.

41.     During the Class Period, the QDIA for the ServiceNow Plan was the American Century TDFs from February 21, 2018 through November 30, 2023.

42.     The specific target date portfolio for a participant who fails to make an investment election will be based on the participant's date of birth and an assumed normal retirement date of age 65.

43.     As far as selection of investment options, the  March 2017 IPS provides that the Plan investment consultant, SageView, will take a two-tier approach to fund selection.

44.     Quantitative factors include investment track record, investment risk, investment risk/return, investment style analysis, performance consistency, investment cost, and turnover ratio. March 2017 IPS at 5.

45.     Qualitative factors include investment-style variations, portfolio concentration, and asset size and growth. *Id.*

46.     In addition to diversification and risk tolerance considerations, fund expenses will be considered in the selection of investment alternative. *Id.* at 6.

47.     The March 2017 IPS sets out the "evaluation methodology" for evaluating on an on-going basis Plan investment options using several measures that quantify the expenses, returns, and risk-adjusted performance of each fund within its peer group. *Id.*

48.     Each Plan investment option is reviewed *at least annually* against its peer group and benchmark index to assess the performance and quality of each offering. *Id.* (emphasis added).

49.     The following investment criteria are utilized: trailing one-, three-, five- and ten-year returns; rolling 12-month returns (five years); rolling 36-month returns (ten years), Sharpe Ratio (five years); Alpha (five years); Up Capture Ratio (five years); Down Capture Ratio (five years); Style Consistency to the appropriate index (R-Squared); and Expense Ratio. *Id.*

50.     Each Plan investment option is benchmarked to a specific market index, and fund performance is evaluated and compared to a relevant peer group using Morningstar category classifications. A fund is given a peer group ranking in each criterion, shown as a percentage. *Id.*

51.     The rankings for all criteria are then weighted and averaged to a give a fund its average ranking score. An overall SageView score is used to indicate where a fund places in relation to the score of the other funds in its category. *Id.* at 6-7.

52.     Other investment evaluation criteria come into plan when look at multi-asset class investments, like TDFs. *Id.* at 7.

53.     A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.

54.     All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's "glide path."

55.     The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed, but all TDFs are actively managed even if the underlying funds which populate the asset classes are passive funds.

56.     There is no economically meaningful difference between "to-retirement" and "through-retirement" TDFs. In almost all instances, one type of TDF can be replicated using the other type through proper vintage selection. That is, a "to" can replicate a "through" and vice versa.

57.     With regard to TDFs, the March 2017 IPS, states that the "asset allocation and glide path should be evaluated taken into account factors such as generally accepted investment theories

and prevailing investment industry practices, and goals of the plan; the philosophy of the fiduciaries regarding asset class diversification, and the desired relationship of risk (or volatility) and potential return; and the needs and abilities of the participants and beneficiaries." *Id.*

58.    While monitoring investment performance, the Plan Committee is required to maintain a "Watch List" for investment options that are not meeting certain investment objectives. *Id.* at 8.

59.    At minimum, the Plan Committee must, whenever an investment option falls into the 3rd quartile based on the SageView's scoring system, place that investment on the Watch List. *Id.* at 9.

60.    The Watch List investment option will be monitored and remain on the Watch List for four consecutive quarters, even if its performance improves. If the option remains in the 3rd quartile for four consecutive quarters, a detailed review of the option must be made and a recommendation to replace or retain the option should be presented to the Committee. *Id.*

61.    Final selection, replacement and/or removal of an investment option must be completed only after conducting a thorough review of the identified investment option. *Id.*

62.    The benchmark for Target Date investment option category is the S&P Target Date Indexes. *Id.* at 12.

63.    ServiceNow adopted a new IPS in May 2021. *See* ServiceNow Plan Investment Policy Statement (May 2021) ("May 2021 IPS").

64.    The March 2017 IPS and May 2021 IPS are materially identical in all relevant respects, except that the May 2021 adds upfront a "Note" that states the "provisions of this Investment Policy Statement are guidelines only. The fiduciaries are not required to follow them." May 2021 IPS at 1.

65.    That being said, and despite this "Note," the ServiceNow IPS provides the guiding principles and methodologies for the Plan fiduciaries and their investment consultant, SageView.

66.    ServiceNow makes clear in other Plan documents that it seeks to "align directly with the IPS, "establish criteria for selecting a suite of TDFs based on participant demographics,"

and do TDF "review[s] in conjunction with IPS & Investment Reviews." *See* SageView Plan Investment Review 381-382 (Audit Ready Fiduciary File) (December 31, 2018).

67.    Moreover, in every ServiceNow Quarterly Plan Investment Review, SageView undertakes an "IPS Historical Ranking" and/or an "Historical IPS Rankings For Alternatives" based on a SageView scoring system, whose methodology in set out in both the 2017 and 2021 IPS.

68.    In its February 24, 2021 Plan Committee Minutes, the Committee explains about the Plan Watch List: "Each offering is evaluated using nine criteria *set forth in the IPS*. IPS criteria includes the following: trailing returns, rolling 12 months, batting average, risk parameters, style consistency, and fund expenses." ServiceNow Plan Committee Minutes (Feb. 24, 2021) (emphasis added).

69.    Individual TDF vintages (e.g., American Century TDF 2025) can be placed on the Watch List alone, while other TDF vintages may not be listed.

## AMERICAN CENTURY TDFS IN THE SERVICENOW PLAN

70.    SageView provided the Plan Committee with all the necessary information to do the required IPS analysis through quarterly Plan Investment Reviews throughout the Class Period. *See, e.g.,* SageView Plan Investment Reviews for December 31, 2017, December 31, 2018, December 31, 2019, December 31, 2020, December 31, 2021, December 31, 2022, December 31, 2023, and June 30, 2024.

71.    These Plan investment reviews by SageView provided information from December 2017 through June 2024 that illustrated that American Century TDFs had many red flags with regard to its suitability for its Plan population and demographics, its design and structure, and its performance based on numerous quantitative factors outlined in the 2017 and 2021 IPSs.

72.    Nevertheless, the Plan Committee ignored SageView's concerns and did not conduct any TDF suitability analyses or comparative TDF analyses from the beginning of the Clas Period on February 21, 2018 until March 31, 2022, or for over four years. Even then, it took

almost another two years, until December 1, 2023, for the American Century TDFs to be replaced by the Fidelity Freedom Blend TDFs.

73.     If a TDF suitability analysis and a comparative TDF analysis had been completed in late 2017 or early 2018 as it should have been based on the March 2017 IPS, the American Century TDFs could have been replaced by many meaningful benchmark TDFs, including the American Fund TDFs, the Fidelity Freedom Index TDFs, and the Fidelity Freedom Blend TDFs (which was actually selected on December 1, 2023).

74.     All of the comparator TDFs above were selected as "meaningful benchmarks" by the Plan's own investment consultant, SageView, because these comparators have "similar aims, risks, and potential rewards" as the American Century TDFs.  *See Nelson v. F. Hoffman-La Roche, Inc.*, No. 21-cv-10074-TLT, 2022 WL 19765995, at *1 (N.D. Cal. Nov. 2, 2022).

75.     Indeed, the Fidelity Freedom Blended TDFs which replaced the American Century TDFs, albeit on an untimely basis, became the Plan QDIA just like the American Century TDFs.

76.     During the Class Period, participants could invest in various iterations of the American Century TDFs and roughly twenty different mutual funds from other investment managers.

77.     Prior to the start of the Class Period, Defendants had the American Century TDFs in the R6 mutual fund share class.

78.     Because of changes to the American Century TDF management, the American Century TDFs were placed on the qualitative watch list on June 30, 2017. *See* SageView Plan Investment Review 77 (December 31, 2018) (describing changes in American Century TDFs' management).

79.     Because the American Century TDFs fell into the 3rd quartile based on SageView's scoring system, SageView recommended and the Plan Committee accepted placing the American Century TDFs on the quantitative Watch List on October 5, 2017.

80.     Staring in the September 18, 2018 Plan Investment Review conducted by SageView, the Plan Committee only considered mapping out of the American Century R6 mutual

fund share class and into an American Century Collective Investment Trust ("CIT"), called American Century TDF Trust I.

81.    The only difference between the American Century R6 and American Century TDF Trust I was a savings in basis points for TDF fees, but the glide path, fund structure, and performance, were materially identical.

82.    At no time from October 5, 2017 until this mapping into the American Century TDF Trust I occurred in June 2019, did the Plan Committee or SageView undertake a TDF suitability analysis or a general TDF comparative review, in which other TDFs were compared to the American Century TDFs or the suitability of these TDFs was considered based on the investment criteria set out for target date funds in the March 2017 IPS.

83.    Similarly, starting in its March 2020 Plan Investment Review conducted by SageView, the Plan Committee considered mapping out of the American Century TDF Trust I and into the American Century TDF Trust III (also called "Trust S").

84.    Again, the only difference between the American Century Trust I and American Century TDF Trust III/S was a savings of basis points in TDF fees, but the glide path, fund structure, and performance were materially identical.

85.    At no time from December 2020 until this mapping into the American Century TDF Trust III/S in September 2021, did the Plan Committee or SageView undertake a TDF suitability analysis or general TDF review, in which other TDFs were compared to the American Century TDFs or the suitability of these TDFs was considered based on the investment criteria set out for target date funds in the March 2017 or May 2021 IPS.

86.    In February 2021, SageView informed the Plan Committee that American Century TDFs were tilting heavily towards ESG factors, which might not be in the best financial interest of Plan participants.

87.    More specifically, SageView wrote to the Plan Committee that "Ms. Farrell provided an introduction of American Century (AC) and the Stowers Institute for Medical Research (SIMR). Mr Weiss provided an in-depth review of the target date funds and American

Century's target date investment and risk process. Mr. Weiss noted that their target date funds have never invested in tobacco. In addition, 80% of American Century Funds are incorporating ESG factors . . . The investment teams within American Century apply a common proprietary ESG research framework to overall investment." (RUBKE_00003616).

88.    This ESG change in the management of the American Century TDFs should also led to a review of whether the American Century TDFs were still suitable to the Plan demographic or appropriate compared to other TDFs, consistent with the May 2021 IPS. But no such analysis ever occurred.

89.    On December 31, 2021, and because the American Century TDF Trust III/S fell into the 3rd quartile yet again based on SageView's scoring system for five of the American Century TDFs (2030, 2035, 2040, 2045, and 2060), the American Century TDFs were again placed on the quantitative watch list. *See* SageView Plan Investment Review (December 31, 2021).

90.    This time, three months later, SageView finally prepared a Target Date Fund Best Fit Tool and also prepared a Target Date Comparison document on March 31, 2022.

91.    No such Best Fit Tool or Target Date Comparison had been completed by SageView for the Plan Committee from the beginning of the Class Period from February 18, 2018 until March 31, 2022, or for over four years, even though the March 2017 and May 2021 IPSs provide for such reviews on at least an annual basis.

92.    The Best Fit Tool of March 31, 2022, provides that "target date fund selection should be part of a holistic discussion about participant retirement readiness. It should account for both participant demographics and plan design." *See* Best Fit Tool (March 31, 2022) at 255.

93.    The Best Fit Tool set out the target income replacement percentage at 70%, defined as the pre-retirement income that should be replaced between assets in the retirement plan and Social Security benefits. *Id.*

94.    In March 2022, the ServiceNow Plan was only on track to replace 43% of the typical participants salary in retirement, compared to the goal of 70%. *Id.* at 256.

95.     Based on this state of affairs, SageView advised the Plan on March 31, 2022 that "[t]he current target date manager has a conservative glide path. With a young participant base, this plan can offer a more aggressive glide path to offer more investment growth over time. Due to the participant bases investment acumen, life expectancy and control over retirement timing, we could increase the risk to +3." *Id.* at 259.

96.     The same participant base, with the same acumen, life expectancy, and control over retirement time, existed at the beginning of the Class Period on February 21, 2018, and yet SageView waited over four years to come to this conclusion and inform the Plan Committee of the imprudence of continuing to maintaining the American Century TDFs.

97.     For the first time during the Class Period, SageView also carried out a "Target Date Comparison" for the ServiceNow Plan on March 31, 2022, comparing the American Century TDF Trust III/s with the following eight TDF families: (1) American Funds Target Retire R6, (2) BlackRock LifePath Index Institutional, (3) Fidelity Freedom Index Institutional, (4) Schwab Target Index Investor, (5) Vanguard Target Retirement, (6) T. Rowe Price Retire I, (7) MFS Lifetime R6, and (8) Fidelity Freedom Blend K. *See* Target Date Comparison 263-364 (March 31, 2022).

98.     The American Century TDFs have a "distinguishing characteristic" which is a relatively flat in terms of equity exposure. *Id.*  at 263.

99.     On the other hand, the American Funds Target Retire TDFs have a glide path that is defined in terms of changing objectives, rather than allocations, over time. "The series aims to deliver above average equity exposure with below average levels of volatility." *Id.*

100.     For its part, the Fidelity Freedom Blend TDFs "follows a moderately aggressive glide path that aims to appropriately manage growth, potential, longevity, and principal stability as investors age through the use of a risk boundary framework." *Id.* at 264.

101.     Although each of these comparator had different glide paths, different percentage of various asset classes, different "to" versus "through" retirement strategies, and various amounts of passive and active underlying funds, SageView considered them to be "meaningful

benchmarks" because SageView still believed they had "similar aims, risks, and potential rewards" as the American Century TDFs, *See Nelson,* 2022 WL 19765995, at *1, to be considered as replacements for the American Century TDF Trust III/S in the Plan. *Id.* at 263-264.

102.    As required by the May 2021 IPS, the March 2022 Target Date Comparison evaluates asset class coverage, glide paths, performance and category ranking, Sharpe Ratios, risk v. return, net expense ratio, fund structure, underlying funds, and glidepath changes. *Id.* at 265-304.

103.    This TDF analysis shows a low SageView ranking for American Century TDFs and a high ranking for the American TDFs and other TDF families.

104.    The TDF analysis also illustrates that American Century TDFs did not provide an attractive return/risk tradeoff compared to competitor TDFs.

105.    This March 2022 Target Date Comparison is the *only* time during the entire Class Period that the Plan Committee analyzed the American Century TDFs as laid out by the March 2017 IPS and May 2021 in comparison to other TDF families.

106.    Thereafter, the Plan Committee took no action to replace the American Century TDFs for the rest of 2022 even though these TDFs remained on SageView's Watch List and there was overwhelming evidence from SageView that other TDFs were more suitable given the Plan's demographics, saving rates, and plan design.

107.    For instance, in the June 1, 2022, Plan Committee Minutes, the Plan Committee notes that the American Century TDFs remained on the Watch List for quantitative reasons, and states that "[a]s the [QDIA] for the Plan, a more thorough due diligence review of the target date funds was conducted. SageView performed a Target Date Suitability which looked at participant demographics and savings rate."

108.    On June 1, 2022, the Plan Committee also discussed the target fund performance against benchmarks, glide path . . ., expenses and reviewed any changes to the fund's structure and/management," but only concluded that the "Committee will discuss potential fund changes at the next review meeting. This includes the target date investments."

109.    At the next Plan Committee review meeting on August 11, 2022, the Plan Committee "discussed the current target date glide path and agreed to continue a discussion on the glide path as it relates to ServiceNow's demographics."

110.    At that same meeting, the Plan Committee "noted the recent performance [and] agreed to continue this review in future quarters," and stated that "SageView and [the] Committee [will] review investment structure and philosophy for target date suitability before making any target date recommendations."

111.    In the SageView Plan Investment Review of September 30, 2022, SageView presented a similar "Target Date Analysis" to that in the Target Date Review of March 31,2022, comparing American Century TDF Trust III/S to BlackRock LifePath TDFs, Fidelity Freedom Index TDFs, Fidelity Freedom Blend TDFs, American Fund TDFs, Schwab TDFs, Vanguard TDFs, and T. Rowe Price TDFs. *See* SageView Plan Investment Review 30-34 (September 30, 2022).

112.    Given that the Committee had all the necessary information it needed from SageView as of the March 31, 2022, it was imprudent for the Committee to put off any action for all of 2022 as far as replacing the American Century TDFs for one of the other TDF suites.

113.    On March 31, 2023, SageView undertook a second TDF suitability analysis and TDF comparison. *See* Sage View Target Date Comparison and Best Fit Tool (March 31, 2023).

114.    For the second time, SageView established for the Plan Committee that the ServiceNow was substantially underperforming with regard to income replacement, stating that "[y]our plan is on track to replace 49% of the typical participants final salary in retirement, compared to your goal of 70%." *Id.*

115.    Again, SageView advised the Plan in March 2023 that "[t]he current target date manager has a conservative glide path. With a young participant base, this plan can offer a more aggressive glide path to offer more investment growth over time. Due to the participant bases investment acumen, life expectancy and control over retirement timing, we could increase the risk to +3." *Id.*

116.    SageView also recommended that "a moderately aggressive glide path may be most well-suited to your plan." *Id.*

117.    Strangely, the 2023 Target Date Review did not compare the American Century Fund to any other target date fund families, like the March 2022 analysis, and merely looked at the America Century alone with regard to indexed benchmarks and asset class coverage, glide paths, performance and category ranking, Sharpe Ratios, risk v. return, net expense ratio, fund structure, underlying funds, and glidepath changes. *See* 2023 Target Date Review.

118.    In its June 16, 2023 Meeting Minutes, the Plan Committee states with regard to a QDIA review, "[t]he American Century Retirement Date Target Date funds serve as the Qualified Default ("QDIA") for the Plan. As recommended by the Department of Labor (DOL), a due diligence review of the target date funds was conducted using SageView's proprietary tool. The analysis is designed to consider inputs outlined by the DOL in their 2013 publication of eight tips to help plan fiduciar[ies] with target date fund selection and ongoing monitoring."

119.    Remarkably, and even though the American Century TDFs had remained on SageView's Watch List for 18 months since December 31, 2021, "[t]he Committee reviewed the target date funds' performance, glide path (equities to fixed income ratio), asset class coverage, expenses, risks, and underlying fund structure as well as considered any changes to the funds' management structure," and "determined that the current QDIA is reasonable and prudent, and no change is necessary at this time."

120.    Yet, a mere two months later in the August 23, 2023 Plan Committee Minutes, and as part of a target date fund suitability review, SageView "presented a target date suitability and comparison showing alternative options to the American Century One Choice target date funds." *See* ServiceNow Plan Committee Minutes (August 23, 2023).

121.    By August 2023, the Plan Committee Minutes states that only "2 of the 10 American Century Retirement Date Target Date funds passed SageView scoring criteria." The following American Century TDF funds fell into SageView's third quartile scoring: 2030, 2035, 2040, 2045, 2050, 2055, and 2060.

122.    In response, SageView set up three "meaningful benchmarks" to the American Century Fund for the Plan Committee to consider : American Funds (Capital Group CIT), Fidelity Freedom Blend CIT, and the Fidelity Freedom Index CIT.  *Id.*

123.    SageView reviewed "performance, risk statistics, underlying investments, investment structure and investment expenses of each alternative option presented. SageView noted that American Funds uses an actively managed approach only which is why fees for those funds were a little higher and Fidelity Freedom Blend took an active and indexed approach which resulted in lower overall investment costs of those funds." *Id.*

124.    According to SageView, "[p]erformance of the American Funds and Fidelity Freedom Blend were very similar across most vintages. The Committee voted to move forward with a change to the Fidelity Freedom Blend CIT." *Id.*

125.    The Plan Committee could have done this same analysis as early as June 2022 based on the March 2022 TDF Review, as the same information about the comparative suitability and performance of the American Century TDFs compared to the alternative could have been completed.

126.    The Plan Committee also agreed to replace the American Century TDFs as the QDIA with the Fidelity Freedom Blend TDFs, effective December 1, 2023.

127.    These actions in August 2023 make the Plan Committee's QDIA findings in June 2023 lack any credibility or legitimacy with regard to the reasonableness of the American Century TDF being the Plan QDIA, and establishes that the Plan Committee was not paying sufficient attention to TDF investment issues.

128.    There is no reasonable or prudent reason why the Plan Committee waited so long, almost two years since the American Century TDFs were placed on the Watch List on December 31, 2021, and to the point where only 2 of 10 American Century Funds passed the SageView scoring criteria by August 2023.

129.    A prudent plan fiduciary would have replaced these American Century TDFs substantially earlier, especially since according to both the 2017 and 2021 IPS that "[e]ach Plan

Investment option [must be] reviewed at least annually against its peer group and benchmark index to assess the performance and quality of each offering."

130.    For TDFs, this means that the Plan IPS requires that "the asset allocation and glide path should be evaluated taking into account factors such as generally accepted investment theories and prevailing investment industry practices, and goals of the plan, the philosophy of the fiduciaries regarding asset class diversification and the desired relationship of risk {or volatility) and potential return, and the needs and abilities of the participants and beneficiaries."

## THE PLAN'S IMPRUDENT INVESTMENT IN THE AMERICAN CENTURY TARGET DATE FUNDS

131.    The ServiceNow Plan offered either the R6, Trust I, or Trust III (S) version of the American Century TDFs from at least June 2017 through November 30, 2023.

132.    The Plan Committee was responsible for crafting the Plan lineup and could have chosen other target date families than the American Century TDFs at the beginning of the Class Period on February 21, 2018.

133.    The Plan Committee was responsible to follow the evaluation criteria and methodology set out in the both the March 2017 and May 2021 Plan IPSs, but failed to do so.

134.    In other words, the Plan Committee deviated from the "guidelines concerning the selection, evaluation, and monitoring of Plan investment options" in the March 2017 and May 2021 IPS. *See Bracalente*, 2024 WL 2274523, at * 2.

135.    As a result numerous defects in their fiduciary process, the Plan Committee did not remove the American Century TDFs from the Plan until December 1, 2023, almost six years later than they should have had if the Plan Committee had followed their Plan IPS and the advice of their Plan investment consultant, SageView.

136.    The Plan Committee engaged in at least five major Plan fiduciary process errors during the Class Period that deviated from "guidelines concerning the selection, evaluation, and monitoring of Plan investment options" in the March 2017 and May 2021 IPS:

a.    The Plan Committee failed to undertake a single TDF suitability analysis or TDF comparative analysis, as directed by the Plan 2017 and 2021 IPSs, from February 21, 2018 through March 31, 2022.

b.    SageView, the Plan investment consultant during the entire Class Period, provided quarterly investment plan reviews which raised multiple red flags that the Plan Committee consistently ignored from June 30, 2017, when American Century TDFs were first placed on the Plan Watch List, until they were replaced on December 1, 2023, by the Fidelity Freedom Blend TDFs.

c.    Rather than undertake a suitability or comparative TDF analysis for the American Century TDFs as directed by the Plan 2017 and 2021 IPSs, the Plan Committee focused singularly on TDFs fees in moving from the American Century TDFs R6 mutual fund share class to the Trust I version of the American Century TDFs in 2019 and to the Trust III version of the TDFs in 2021.

d.    The Plan did not evaluate whether the American Century TDF was still suitable for the Plan demographic once they were informed that American Century TDFs were becoming substantially tilted to ESG investing in February 2021.

e.    Once the appropriate suitability and comparative TDF analysis was completed by SageView on March 31, 2022 for the American Century TDFs, it took almost two years to replace the imprudent American Century TDFs on December 1, 2023, when a replacement TDF could have been completed much earlier based on the March 2022 SageView analysis.

137.    Through at least these five major fiduciary process defects, which amount to objectively unreasonable and imprudent conduct, Defendants breached their fiduciary duties of

prudence by retaining and not removing the American Century TDFs from February 21, 2018 until December 1, 2023. *See Phillips,* 2024 WL 3228097, at *8.

138.   Prudent alternative TDF options existed for the American Century TDFs – "meaningful benchmarks" identified by the Plan investment consultant, SageView, that were more suitable in terms of asset class coverage, glide paths, performance and category ranking, Sharpe Ratios, risk v. return, net expense ratio, fund structure, underlying funds, and glidepath changes, all criterion outlined in the Plan's March 2017 and May 2021 IPSs.

139.   These "meaningful benchmark" TDFs identified by SageView included American Fund TDFs, Fidelity Freedom Index TDFs, and Fidelity Freedom Blended TDFs, among others.

140.   Each prudent alternative investment option was available to replace the American Century TDFs at the beginning of the Class Period on February 21, 2018, if the Plan Committee had prudently followed the IPS methodology for target date funds.

141.   Instead, the Plan Committee, through SageView, did not complete the necessary analysis until March 31, 2022, and then did act on this information and remove the imprudent American Century TDFs until December 1, 2023.

142.   During the Class Period, Plaintiffs had no knowledge of Defendants' process for selecting TDFs and for regularly monitoring them to ensure they remained prudent.

143.   During the Class Period, Plaintiffs had no knowledge of how the performance of the TDFs compared to readily-available prudent alternative investments and whether the American Century TDFs remained suitable given Plan demographics and other Plan features.

144.   During the Class Period, Plaintiffs did not know about the availability of comparable investment options that Defendants failed to reasonably offer at the beginning of the Class Period on February 21, 2018, because Defendants provided no suitability or comparative TDF information to allow Plaintiffs to evaluate and compare Defendants' potential TDF options.

145.   Defendants were imprudent starting on February 21, 2018 in retaining the American Century TDFs, and should have known from the information presented by SageView

about the American Century TDFs' lack of suitability for the Plan demographics, its imprudent structure and plan design, and its poor, historical investment performance adjusted for risk.

146. During the Class Period and because Defendants imprudently did not chose prudent, alternative TDFs at the beginning of the Class Period, Defendants caused unreasonable and unnecessary losses to Plaintiffs and Plan participants invested in the American Century TDFs in the tens of millions of dollars.

147. Defendants caused objectively unreasonable losses to Plaintiffs and the Plan's participants of over $30 million dollars from February 28, 2018 through September 30, 2024, when considering the retirement losses suffered by Plaintiffs and the Class by the Plan Committee maintaining various versions of the American Century TDFs as the Plan QDIA rather than replacing the American Century TDFs with one of the "meaningful benchmark" TDF families identified by SageView and presented to the Plan Committee in its TDF comparative reviews, the American Fund TDFs.[1]

148. The following chart illustrates the damages suffered for each vintage of the American Century TDF from the 2020 TDF vintage to the In Retirement TDF vintage by maintaining the American Century TDF as the Plan QDIA instead of selecting, at the beginning of the Class Period, a more suitable and prudent alternative suite of TDFs, like the American Fund TDFs, as the Plan's QDIA:

---

[1] Damages are computed relative to the American Fund TDFs from February 28, 2018 through November 30, 2023, when the Fidelity Freedom Blended TDFs replaced the American Century Funds in the Plan. From there, damages are compounded forward through September 30, 2024.

|  | Damages (09/30/2024) |
|---|---|
| American Century Investments One Choice 2020 Portfolio R6 / Trust I / Trust S | $ 287,195.26 |
| American Century Investments One Choice 2025 Portfolio R6 / Trust I / Trust S | $ 780,892.72 |
| American Century Investments One Choice 2030 Portfolio R6 / Trust I / Trust S | $ 2,023,001.87 |
| American Century Investments One Choice 2035 Portfolio R6 / Trust I / Trust S | $ 4,938,038.30 |
| American Century Investments One Choice 2040 Portfolio R6 / Trust I / Trust S | $ 6,238,436.81 |
| American Century Investments One Choice 2045 Portfolio R6 / Trust I / Trust S | $ 6,462,210.77 |
| American Century Investments One Choice 2050 Portfolio R6 / Trust I / Trust S | $ 4,988,126.50 |
| American Century Investments One Choice 2055 Portfolio R6 / Trust I / Trust S | $ 2,827,559.57 |
| American Century Investments One Choice 2060 Portfolio R6 / Trust I / Trust S | $ 1,678,519.52 |
| American Century Investments One Choice In Retirement Portfolio / Trust I / Trust S | $ (5,671.51) |
|  | $ 30,218,309.81 |

149.    Because if the Plan Committee applied the Plan IPS correctly at the beginning of the Class Period, it should have selected a more suitable and prudent meaningful benchmark TDF suite, like the American Fund TDFs. Damages are thus calculated above by comparing on a quarterly basis the performance return, net of fees, of the American Century TDFs for each vintage, as compared to the performance return, net of fees, of the American Funds TDFs for each vintage, during the Class Period.

150.    Both Plaintiffs were invested in one of the American Century TDFs (either the American Century TDF 2020 or 2050 Funds) during the Class Period, and thus, suffered an injury-in-fact to their individual retirement accounts in the ServiceNow Plan.

151.    Because the retirement losses caused are the same for all vintages of the American Century TDFs, Plaintiff can also represent the claims of Class members who were invested in other vintages of the American Century TDFs.

152.    These identified American Fund TDFs alternative investments are not unique in their ability to replace the American Century TDFs. Other meaningful benchmarks, including the Fidelity Freedom Blended TDFs and Fidelity Freedom Index TDFs, were identified by SageView for the Plan Committee as alternative investments and meaningful benchmark for the Plan Committee to consider for replacement purpose.

153.    This analysis in ***no way uses hindsight*** as it is solely based on information that the Plan Committee had available to them through SageView's Investment Plan Reviews as early as the beginning of the Class Period on February 21, 2018.

154.    The delay in replacing the American Century TDFs with more suitable and more prudent TDFs deprived participants of compounded returns.

155.    By failing to engage in an objectively reasonable fiduciary process when retaining and failing to remove American Century TDFs from February 21, 2018, until December 1, 2023, Defendants breached their fiduciary duties of prudence to Plaintiffs and Plan participants and are liable to Plaintiffs and Class Members for the retirement monies lost through the imprudent investment in the American Century TDFs through most of the Class Period.

## CLASS ACTION ALLEGATIONS

156.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

157.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the ServiceNow, Inc. 401(k) Plan who invested in any of the American Century Target Date Funds (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning February 21, 2018, and running through the date of judgment.

158.    The Class includes up to 13,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

159.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owes fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

160.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Plan participants during the time period at issue and the designated participants in the Plan were harmed by Defendants' fiduciary misconduct in the same manner.

161.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Plan participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

162.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

163.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

164.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

165.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

166.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

167.    Any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

### FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class,
### <u>Against Defendants – Challenged TDFs)</u>

168.    Plaintiffs restate the above allegations as if fully set forth herein.

169.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

170.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in managing the investments of the Plan.

171.    Defendants, as a fiduciaries of the Plan, through their Plan Committee, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

172.    During the Class Period, Defendants had a fiduciary duty, through their Plan Committee, to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

173.    During the Class Period, Defendants, through their Plan Committee, breached their fiduciary duties of prudence to Plan participants, including to Plaintiffs, by failing to manage the TDFs of the Plan prudently, and failing to act with the care, skill, diligence, and prudence required by ERISA.

174.    Defendants, as a fiduciaries of the Plan, through their Plan Committee, had a continuing duty to regularly monitor and independently assess through the Plan 2017 and 2021 IPSs whether the Plan's TDFs were prudent choices for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

175.    During the Class Period, Defendants, through their Plan Committee, breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDFs and by failing to remove imprudent TDFs investments within a reasonable period.

176.    Defendants, through their Plan Committee, were directly responsible for: evaluating and monitoring TDFs options in a prudent fashion, consistent with the Plan IPS and with information provided by their Plan investment consultant, SageView, and eliminate TDFs, like the American Century TDFs, that were no longer prudent, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

177.    Defendants, through their Plan Committee, failed to employ a prudent fiduciary process, based on the Plan IPS, by failing to monitor evaluate the American Century TDFs for suitability given Plan demographics and in comparison to other meaningful benchmark TDFs.

178.    Defendants, through their Plan Committee, failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

179.    As a result of Defendants', through their Plan Committee's, breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered tens of million dollars in unreasonable and unnecessary monetary losses.

180.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA,**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendants– Challenged TDFs)**

181.    Plaintiffs restate the above allegations as if fully set forth herein.

182.    Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management on the Plan Committee and were aware that these fiduciaries had critical responsibilities for the Plan.

183.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

184.    Defendants had a duty to ensure that the individuals responsible for Plan investment management on the Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their

duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

185.    Defendants breached their duty to monitor individuals responsible for Plan investment management on the Plan Committee, by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent American Century TDFs for most of the Class Period;

b.    Failing to monitor the process by which Plan TDFs were evaluated, failing to investigate the suitability of the American Century TDFs based on Plan demographics and failing to investigate the availability of alternative, prudent TDFs; and

c.    Failing to remove individuals responsible for Plan investment management on the Plan Committee whose performance was inadequate in that they continued to maintain the American Century TDFs, even in light of their responsibilities under the Plan IPS and the information provided by SageView, all to the detriment of the Plan and Plan participants' retirement savings.

186.    As a result of Defendants foregoing breaches of the duty to monitor, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.

187.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management on the Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties of prudence and to monitor under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the American Century TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E.      An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.      An award of pre-judgment interest;

G.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      Such other and further relief as the Court deems equitable and just.

Dated this 8th day of November, 2024.

Respectfully submitted,

_s/ Paul M. Secunda_

Joseph A. Creitz                        Paul M. Secunda*
CREITZ & SEREBIN LLP           * admitted pro hac vice
100 Pine Street, Suite 1250          WALCHESKE & LUZI, LLC
San Francisco, CA 94111             235 N. Executive Dr., Suite 240
Telephone: (415) 466-3090          Brookfield, Wisconsin 53005
Fax: (415) 513-4475                   Telephone: (414) 828-2372
Email: joe@creitzserebin.com       E-Mail: psecunda@walcheskeluzi.com

*Counsel for Plaintiffs and Proposed Class*